## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTIAN CONCEPCION, for himself and others similarly situated, | **Case: 1:21-cv-11100-NMG** |
| v. | |
| TRAINCROFT, INC. | |

## MEMORANDUM IN SUPPORT OF FINAL APPROVAL
## OF CLASS ACTION SETTLEMENT

**1.    SUMMARY.**

Christian Concepcion seeks final approval of this class action settlement because: (1) the non-reversionary Settlement is fair and reasonable; and (2) after adequate notice, every Class Member elected to become a Participating Class Member and will receive a payment following final approval (i.e., not one Class Member submitted a request for exclusion). Further, not a single Participating Class Member lodged any objection, further confirming the Settlement is fair and reasonable. *See, e.g., In re Solodyn Antitrust Litig.*, 2018 WL 7075881, at \*2 (D. Mass. July 18, 2018) (citing *Gunter v. Ridgewood Energy Cor*p., 223 F.3d 190, 195 n.1 (3d Cir. 2000)).

**2.    BACKGROUND.**

On July 2, 2021, Concepcion sued Traincroft. Dkt. 1. Concepcion alleged Traincroft paid him and those similar situated to him a flat hourly rate for all hours worked, even those after 40 in a week, in violation of state and federal law. *Id.* at ¶¶ 4, 5, 32-46, 69-76. He claimed Traincroft also attempted to mask its overtime violations by mislabeling part of its hourly wages as an hourly "per diem" so that its payroll records would suggest that it was paying overtime. *Id.* at ¶¶ 47-51. Concepcion asserted Traincroft applied this payment scheme extended to more than 100 hourly workers. *Id.* at ¶¶ 71-73. He therefore sought to maintain a collective action on behalf of "All hourly Traincroft employees who

were paid 'straight time' for overtime at any point in the past 3 years." *Id.* at ¶¶ 81-82. He further

alleged a Rule 23 class action under state law for "All hourly Traincroft employees in New Mexico

who were paid 'straight time' for overtime." *Id.* at ¶ 85.

Traincroft denied the allegations generally and affirmatively. Dkt. 6 at pg. 9. It disputes liability

on all counts, denies class and collective action treatment was appropriate, and argues Concepcion

was an inadequate class representative. *Id.* For more than a year, the Parties engaged in discovery,

exchanged documents, responded to interrogatories, and debated each party's arguments, rebuttals,

and legal authorities relative to the claims and defenses asserted in this case.

After sufficient information was exchanged, the parties agreed to mediate with Michael N.

Ungar. See https://www.ulmer.com/attorneys/ungar-michael-n/. Mr. Ungar is a respected mediator

and the Chair of the Litigation Department at Ulmer & Berne, LLP. Both Parties prepared detailed

statements for Mr. Ungar and conferred with him repeatedly prior to the actual full-day mediation on

May 23, 2022. The mediation failed.

However, the Parties continued their efforts to reach a resolution by analysis and financial

information to Mr. Ungar. The parties also reached a confidentiality agreement to facilitate continued

negotiations. The information exchanged, as well as publicly available, shows Traincroft is a small

company providing services to the highly competitive aviation market. As a staffing company,

Traincroft is highly reliant on its skilled workforce, its client relationships, and the reputation it has

built since 1999. And like most staffing companies, Traincroft's margins are dependent on the markup

for the employees they place. Thus, providing additional compensation not paid, or reimbursed, by its

clients can present a significant outlay for Traincroft. Settling the class claims for such additional

compensation demanded the Parties agree upon an amount and payment structure which would allow

Traincroft to remain viable and to continue to provide jobs to the marketplace.

Based on the information provided, productive discussions occurred for several months after the mediation. With Mr. Ungar's assistance, the Parties were able to narrow the issues and adjust the settlement range. It was determined Traincroft would need to resolve all similarly situated employees claims, regardless of where they worked, to ensure its viability and ability to make settlement payments. After several more conferences, the Parties were able to agree to a settlement in principle and resolve their disputes as to the release language.[1]

As the Court recalls, the Settlement provides a total of $441,500 in consideration for a release of the wage claims of the Participating Class Members. The Gross Settlement Amount represents: (1) approximately 49.88% of the unpaid wages ($885,108.37) alleged to be owed to the Class; and (2) approximately 16.63% percent of a class-wide "home-run" under the counts in the Complaint. *See* Exhibit 1 (Settlement Agreement). Particularly given Traincroft's financial condition, the Settlement is fair, reasonable, and adequate, and provides substantial benefit to the Participating Class Members, while accounting for the substantial costs, risks, and delays associated with continued litigation (e.g., the risk of a loss on the merits, Traincroft's inability to withstand a greater judgment, and the risk/delay of post-trial appeals).

On September 12, 2023, this Court preliminarily approved the settlement. Dkt. 47.

**3.   THE CLASS'S REACTION TO THE SETTLEMENT WAS UNIFORMLY POSITIVE.**

Following preliminary approval, the approved Settlement Administrator (ILYM Group) worked with the Parties to scrub the class data so that only those covered by the Settlement received notice and, assuming final approval is granted, receive a share. For example, the Settlement

---

[1] As this Court also recalls, negotiating the actual terms of the Settlement took significantly longer than expected. Indeed, the parties spent several months, generating dozens of drafts and emails and requiring numerous extensions, to reach the final terms. *See* Dkts. 25, 27, 29, 31, 33, 35. The Settlement is the result of extensive and contentious negotiations, and the result of a highly skilled mediator dedicated to achieving a favorable outcome for all Parties.

Administrator identified duplicate entries for the same individual. In addition, the Parties agreed to exclude a few potential class members who had not worked overtime during the Class Period and thus would not receive money from the Settlement. All told, a total of 196 Class Members received notice.

Prior to sending the notices, the Settlement Administrator ran the list of Class Members through the U.S. Postal Service's National Change of Address database and performed a skip trace. While 27 notices were nonetheless returned, the Settlement Administrator located a forwarding address for 26. *See* Exhibit 2 (Final Report of Settlement Administrator). In addition, 10 Class Members requested (and received) a copy of the Class Action Notice. *Id.* Thus, the notice program was very effective, with only 0.51% ultimately undeliverable despite these efforts. *Id.*

Any Class Members who desired further information could reach out to Class Counsel. However, the most common request received by Class Counsel was how to update their address with the Settlement Administrator. No-one from the Class voiced any objection to Class Counsel. Further, not one Class Members submitted a written objection or requested exclusion.

Every Class Member thus elected to become a Participating Class Members. Because the Settlement does not require a claim form (or create any other barrier to compensation), every Class Member will receive their Individual Settlement Share and every cent of the settlement will be paid.

**4.    THE SETTLEMENT SATISFIES THE REQUIREMENTS FOR FINAL APPROVAL.**

Public policy "strongly" favors settlements. *See, e.g., E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 744 (1st Cir. 1996). This is particularly true when it comes to class actions, which are "often complex, drawn out proceedings demanding a large share of finite judicial resources," *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993), and "where one proceeding can resolve many … claims that might otherwise threaten to swamp the judiciary." McLaughlin on Class Action § 6:3. That said, class settlements are subject to court approval to ensure they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *see also In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 195 (D. Mass. 2005).

To determine if a settlement is "fair, reasonable, and adequate," a court examines whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     relief provided for the class is adequate, taking into account:

    (i)    the costs, risks, and delay of trial and appeal;

    (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)   any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

*See* Fed. R. Civ. P. 23(e)(2).

### A. The Class Received Adequate Representation.

Concepcion and Class Counsel adequately represented the Class. Concepcion declined an early offer to resolve his individual claims because he had committed to representing others workers impacted by what he considered to be an illegal policy. Very conservatively, Concepcion delayed his individual recovery by a year or more to ensure a fair result for the Class. There are no conflicts between Concepcion and the Class, all of whom assert the same claims and seek the same relief.

Further, prior to settlement, the parties litigated for more than a year, including substantial written discovery, a (failed) full day mediation, extensive legal research and analysis, and multiple follow-up settlement negotiation sessions. Through discovery, Plaintiffs' counsel obtained payroll data of all Class Members so they could calculate the potential damages (assuming a Rule 23 class was certified and that the Class was successful in establishing liability). Class Counsel also analyzed financial information to determine the extent to which Traincroft could withstand a greater judgment, as well as its ability to finance a greater settlement.

**B. The Settlement Was Negotiated at Arm's Length.**

As courts have noted, "the participation of an independent mediator in settlement negotiations virtually ensures that the negotiations were conducted at arm's length and without collusion between the parties.'" *In re Viropharma Inc. Sec. Litig.*, 2016 WL 312108, at *8 (E.D. Pa. Jan. 25, 2016); *see also, Wright v. S. New Hampshire Univ.*, 565 F. Supp. 3d 193, 206 (D.N.H. 2021); *Glynn v. Maine Oxy-Acetylene Supply Co.*, No. 2:19-CV-00176-NT, 2022 WL 17617138, at *4 (D. Me. Dec. 13, 2022) (use of a respected mediator supports a finding of "fair, arm's length negotiations"). In this case, Mr. Ungar, is not only a respected mediator but also the Chair of the Litigation Department at Ulmer & Berne, LLP.

But even with his assistance, the parties in-person mediation session in May 2022 failed to reach a settlement. It was only after multiple, virtual follow-up sessions, that the Parties' hard-fought negotiations finally resulted in the Settlement. Moreover, as the Court knows, the Parties battled for months to agree upon the specific terms of the Settlement (even after the deal was "done"). There is simply no question the Settlement resulted from arm's length negotiations.

**C. The Relief Provided for the Class Is Adequate.**

"Where 'the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable." *Robinson v. Nat'l Student Clearinghouse*, 14 F.4th 56, 59 (1st Cir. 2021) (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009)). However, even beyond this presumption, the substantial relief provided by the Settlement supports approval. Concepcion estimates the total unpaid wages owed during the Class Period was $885,108.37. Dkt. 46 at 1. Based on this estimate, the $441,500 recovery represents 49.88% of the unpaid wages owed (assuming class certification was granted). Further, the Gross Settlement Amount is approximately 17% of the Class's absolute "best day at the courthouse" if successful in establishing their absolute maximum recovery. *Bradford v. Naples Causeway Dev., LLC*, No. 2:21-CV-00015-NT, 2022 WL 3154760, at *2 (D. Me. Aug. 8, 2022) ("Plaintiff's settlement amount, which is approximately

20.8% of the best-case-scenario maximum she could recover after success at trial and any appeals, is a reasonable compromise.").

Although Concepcion was confident in the merits of his claims, Traincroft asserted several defenses, including that it would vigorously challenge collective and class certification as well as contest Concepcion's ability to adequately represent the class. Dkt. 6 at pg. 9. Moreover, Traincroft raised exemptions defenses and intended to present proof it: (1) properly paid the proposed class; and (2) acted in good faith (as evidenced by the fact Concepcion's then-current employer paid him under the same pay arrangement as Traincroft). *Id.* at 9-10.

On a more practical level, had the case resulted in a favorable judgment, the Class faced lengthy appeals and potential collectability concerns. Traincroft cannot sustain an extended or significant outlay on its own, being a smaller company and where its profits depend on a markup paid or reimbursed by its clients. Therefore, the Gross Settlement Amount represents a fair settlement of the Class's claims, particularly considering the hurdles  to obtaining any class-wide relief.

The notice approved by the Court was effective in notifying the Class of their rights. Because Class Members are not required to submit a claim form to receive their Individual Settlement Share, there can be no question the method for processing claims is favorable to the Class. The reaction from the Class proves those entitled to money from the Settlement view its terms favorably. To date, there have been no objections to any aspect of the Settlement or related applications. Class counsel have responded to questions from the Class by providing information regarding the Settlement and claims process. Not one Class Member voiced any opposition to the Settlement. Not one asked to be excluded from the Settlement.

Concepcion and Class Counsel believe the Settlement is an excellent result for the Class. As discussed in greater detail below, the proposed attorney's fee award and incentive payments are also fair and reasonable here.

### D.  All Class Members Are Treated Equitably.

Finally, all Participating Class Members will receive equitable treatment under the Settlement because a uniform formula will be used to calculate settlement shares. Ex. 1. at ¶ 23(d)(ii). The formula uses a proportionate amount for each qualifying overtime hour that each class member worked and divides the entire net settlement amount among all class members based on the total amount of qualifying overtime hours worked by all class members. *Id.* at ¶ 23(d)(ii) and (iii). This method most closely approximates the potential unpaid overtime and remaining damages that were allegedly recoverable on a pro rata basis. And, again, every Class Member will receive their Individual Settlement Share without having to fill out a claim form.

The Settlement is the product of vigorous litigation and arm's-length negotiation by experienced and well-informed counsel, and it provides significant relief to the Settlement Class. See Fed. R. Civ. P. 23(e)(2)(B). Because it is fair, reasonable, and adequate, it warrants final approval.

### 5.  THE ATTORNEYS' FEES AND INCENTIVE AWARD ARE FAIR AND REASONABLE.

### A.  Class Counsel's Fees and Costs Are Reasonable.

Class Counsel expertise in litigating class and collective action under state and federal wage laws is well-established.[2] Under the Settlement, approximately one-third ($145,833) of the Gross

---

[2] *See, e.g., Robertson v. Enbridge (U.S.) Inc.*, No. 2:19-CV-1080-WSS-LPL, 2021 WL 8342845, at *1 (W.D. Pa. Dec. 17, 2021) ("Class Counsel have substantial experience prosecuting and resolving employment class actions, particularly wage-and-hour class actions, and are well-versed in class action and wage-and-hour law"); *Robertson v. Whitman Consulting Org., Inc.*, No. 19-CV-2508-RM-KLM, 2021 WL 4947349, at *5 (D. Colo. Oct. 25, 2021), adopted, 2021 WL 5826410 (D. Colo. Dec. 8, 2021) ("Plaintiffs' Counsel has extensive experience in litigating FLSA collective action claims"); *Cormier v. Turnkey Cleaning Servs. LLC*, No. 6:15-CV-2076, 2018 WL 5288824, at *4 (W.D. La. Oct. 22, 2018), adopted, No. 6:15-CV-02076, 2018 WL 5623596 (W.D. La. Oct. 30, 2018) (Bruckner Burch's "skill, knowledge, reputation and experience is well-recognized in FLSA cases such as this"); *Kurgan v. Chiro One Wellness Centers LLC*, No. 10-CV-1899, 2015 WL 1850599, at *4 (N.D. Ill. Apr. 21, 2015) (collecting cases and noting counsel are "among the most experienced and best regarded in this specialized practice area"); *Girault v. Supersol 661 Amsterdam, LLC*, 1:11 CIV 6835 PAE, 2012 WL 2458172, at *2 (S.D.N.Y. June 28, 2012) (Bruckner Burch lawyers "are experienced and well-qualified employment lawyers and class action lawyers and have particular expertise in prosecuting and settling

Settlement Amount ($441,500) will be paid as attorneys' fees. In addition, Class Counsel will receive reimbursement for $24,000 in costs, including paying for the third-party settlement administrator. Ex. 1 at ¶ 23(b), (c). Similar amounts are consistently approved by courts as they are fair and reasonable in cases like this one. *See, e.g.*, *Matamoros v. Starbucks Corp.*, No. 1:08-cv-10772, ECF 161, 167, 169 (Gorton, J.) (awarding a 1/3 fee on a $23.5 million settlement); *see also Roberts v. TJX Companies, Inc.*, 2016 WL 8677312 (D. Mass. Sept. 30, 2016) (awarding 33% of $4.75 million settlement); *Johnson v. Morton's Restaurant Group*, Civ. A. No. 05-11058 (D. Mass. 2009) (awarding 33.3% in a $12 million wage settlement); *Sylvester v. Cigna Corp.*, 401 F. Supp. 2d 147 (D. Me. 2005) (awarding 33% of $2.3 million recovery); *In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 82 (D. Mass 2005) (Singal, J.) (awarding 33% of $67 million settlement); *Chalverus v. Pegasystems, Inc.*, Civ. A. No. 97-12570 (D. Mass. 2000) (awarding a 1/3 fee in a $5+ million settlement); *In re Picturetel Corporation Sec. Litig.*, C.A. No. 97-12135-DPW (D. Mass. Nov. 4, 1999) (1/2 fee of a $12 million settlement fund).[3]

Moreover, courts favor awarding fees based upon the percentage of the fund method. As the Supreme Court has explained:

> [T]his Court has recognized consistently that … a lawyer who recovers a common fund for the benefit of persons other than … his client is entitled to a reasonable attorneys' fee from the fund as a whole. … Jurisdiction over the fund involved in the litigation allows a Court to prevent … inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (cites omitted); *see also Blum v. Stenson*, 465 U.S 886, 900 n.16 (1984).

---

wage and hour class actions"); *Davis v. Footbridge Eng'g Servs., LLC*, 09CV11133-NG, 2011 WL 3678928, at *4 (D. Mass. Aug. 22, 2011) (noting Bruckner Burch's success in the field of wage and hour litigation).

[3] Additional settlements approving a 1/3 fee include: *Martins v. 3PD, Inc.*, No. 11-11313 (July 22, 2016) (ECF No. 211); *Civil v. Spirit Delivery*, No. 13-12635 (D. Mass. July 24, 2018) (ECF No. 242); *DaSilva v. Border Transfer*, No. 16-11205 (D. Mass. Oct. 16, 2019) (ECF No. 189); *Garcia v. E.J. Amusements of New Hampshire, Inc.*, C.A. No. 13-12536 (D. Mass. 2015).

Further, the First Circuit recognized the percentage approach is less burdensome to administer than the lodestar method. *See Thirteen Appeals*, 56 F.3d at 307. The court also endorsed the percentage of recovery approach because it is result-oriented, thereby promoting the more efficient use of attorney time and resources, rather than encouraging attorneys to prolong litigation to inflate their recoverable hours. *See id.* ("[U]sing the [percentage of fund] method … enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency. Under the latter approach, attorneys not only have a monetary incentive to spend as many hours as possible (and bill for them) but also face a strong disincentive to early settlement"). Similarly, the Court observed that the percentage method better approximates the workings of the marketplace by ensuring that attorneys receive compensation for the true value of their services and skills. *See id.* ("Another point is worth making: because the [percentage of fund] technique is result-oriented rather than process-oriented, it better approximates the workings of the marketplace [because] the market pays for the result achieved") (quoting *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992)).

Finally, awarding a percentage of the common fund, such as the 33% fee in this case, recognizes and encourages the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees. Unlike traditional firms who are paid monthly, plaintiff's attorneys who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, document production, and so forth), without ever receiving any ongoing payment for their work. Sometimes fees and expenses are recovered; other times, despite hundreds or even thousands of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees.

Courts have long recognized this reality. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) ("[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has

ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate"). Courts, therefore, routinely approve fee awards approximating 1/3 fee when "the attorneys' fees requested [are] entirely contingent upon success." *Macedonia Church v. Lancaster Hotel, LP*, 2011 WL 2360138, *14 (D. Conn. June 9, 2011).

Permitting clients to obtain attorneys without having to pay hourly fees provides access to the courthouse for people who would not otherwise be able to find competent counsel. That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue. Such "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Skirchak v. Dynamics Research Corp., Inc.*, 432 F. Supp. 2d 175, 179 (D. Mass. 2006) ("Allowing private attorneys to prosecute [wage] actions in the aggregate effectively ensures enforcement of the wage laws by motivating employers to comply or face potentially large-scale litigation, and by providing counsel with an incentive to pursue such claims"), *aff'd* 508 F.3d 49 (1st Cir. 2007).

Empirical data also supports Class Counsel's fee. Vanderbilt Professor Brian T. Fitzpatrick, whose work this Court has cited, recently performed an extensive review of the contingency fees actually paid by sophisticated clients in complex litigation. *See* Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2021). He found: "Data from sophisticated clients shows both that they choose to pay fixed one-third percentages or even higher escalating percentages based on litigation maturity just like unsophisticated clients do, and they do so even in the most enormous cases." *Id.* at 1170. Therefore, awarding a 33% fee is also marketplace experience and expectations (as reflected by the complete lack of complaints from the Class).

11

**B. Class Counsel's Lodestar Would Exceed the Requested Fee.**

Under the "lodestar" method, the Court determines "the number of hours reasonably billed to the [plaintiff] and then multiplies that figure by an appropriate hourly rate." *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). In determining the lodestar amount, fees "are to be calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). Once a "fee applicant [ ] produce[s] satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," the rate "is normally deemed to be reasonable." *Id.*

Even though the case is not over, Class Counsel's "lodestar" already exceeds the amount agreed upon in the Settlement. After exercising billing judgment and excluding minor work performed by more junior attorneys, Class Counsel billed nearly 250 hours litigating this case. All this work has been performed on a fully contingent arrangement, with no payment up front. Class Counsel bore all the expenses, costs, and risks associated with litigating this case. Thus, Class Counsel's lodestar confirms the amount is within the range of reasonableness.

**1) Class Counsel's Hours Are Reasonable.**

Even after the exercise of billing judgment, Class Counsel's base hours are 493.3. The following table summarizes the hours expended (and the applicable market rates):

| TIMEKEEPER | ROLE | EXPERIENCE (YEARS) | RATE | HOURS | TOTAL |
|---|---|---|---|---|---|
| Richard Burch | Partner | 26 | $850 | 141.7 | $120,445 |
| Philip Gordon | Partner | 28 | $880 | 6 | $5,280 |
| Kristen Hurley | Partner | 20 | $800 | 11.8 | $9,440 |
| Julie Lomax | Sr. Assoc. | 18 | $600 | 31.5 | $18,900 |
| Griselda Sandels | Paralegal | 17 | $125 | 58.8 | $7,350 |
| | | | | **249.8** | **$161,415** |

*See* Exhibit 3, Declaration of R. Burch. Recall, this case is nearly 3 years old. Over the years, Class Counsel engaged in written discovery, reviewed and analyzed records related to hundreds of workers, and created a comprehensive brief of the various legal issues in this case. *Id.* Notably, many of the issues presented in this case were novel. For example, there are no cases analyzing the scope of Traincroft's claimed exemption to the New Mexico overtime law. After negotiating the Settlement, Class Counsel worked for months to achieve an acceptable agreement and to obtain preliminary approval. The hours are fair, reasonable, and support the (lower) fee agreed upon in the Settlement.

  1. **Class Counsel's Rates Are Reasonable.**

Class Counsel are experienced lawyers specializing in wage and hour law. *See, e.g., Robertson*, 2021 WL 8342845, at *1 (Bruckner Burch and Josephson Dunlap are "well-versed in … wage-and-hour law"); *Horton v. Right Turn Supply, LLC*, 455 F. Supp. 3d 202, 207 (W.D. Pa. 2020) (Josephson Dunlap "conducted themselves professionally, demonstrated deep knowledge of wage-and-hour law, and have been diligent and responsive to the Court's orders"). This Court has commented favorably on Concepcion's lead counsel. *Davis*, 2011 WL 3678928, at *4 (noting Richard J. (Rex) Burch's success in wage and hour litigation). In short, Class Counsel's "skill, knowledge, reputation, and experience are well-recognized in FLSA cases such as this one." *See Cormier*, 2018 WL 5288824, at *4.

Class Counsel's hourly rates are consistent with the "Laffey Matrix" used by many District Courts to assess the reasonableness of attorney fees and the 2021 Attorneys' Fees Hourly Rates, Employment Law Yearbook. *See* http://www.laffeymatrix.com/see.html (establishing a current rate of $1057 per hour for attorneys with 20 years or more of experience, $878 per hour for attorneys with 11-19 years of experience, and $239 for paralegals). Based on annual reviews of the competitive and relevant legal marketplace in Boston, Class Counsel's rates are, on the average, below the rates charged by many other firms in Boston. Given their expertise in wage and hour litigation and the level of skill provided to the Class, their rates are reasonable.

The market-rate survey for the year 2020 shows:

- The median rate in Boston in 2020 for partners with 26+ years' experience was $946 per hour. Sett Exhibit 3 at Ex. B, 2021 BRASS+ Initial Release – Revenue Management Report (Rex Burch's hourly rate is $850, Philip Gordon's hourly rate for this matter is $880).

- The median rate in Boston in 2020 for partners with 20 years' experience was $ 773 per hour. Ex. A, ¶ 46; Ex. B (Kristen Hurley's hourly rate is $800).

- The median rate in Boston in 2020 for senior attorneys with 13+ years' experience was $722 per hour. Ex. A, ¶ 47; Ex. B (Julie Lomax's hourly rate is $600).

Relying on more recent information from *Thompson Reuters Financial Insights* database, this District awarded fees at the rate of $735 an hour to an associate with "eight years of litigation experience[.]" *DMO Norwood LLC v. Kia Am., Inc.*, No. 22-CV-10470-ADB, 2023 WL 8477408, at *3 (D. Mass. Dec. 7, 2023).

Courts have applied a variety of rates to paralegal work. *Compare Sullivan v. Experian Info. Sols., Inc.*, No. 16-11719-MPK, 2022 WL 392848, at *10 (D. Mass. Feb. 9, 2022) ("In this district, judges have found that $125/hour for paralegals ... is reasonable.") with *Aguiar Dias v. De Souza*, No. 16-40049-TSH, 2016 WL 6821067, at *3 (D. Mass. Nov. 17, 2016) (noting that $150 per hour "may be the norm for Boston"). However, Class Counsel's request for $125/hr for a paralegal with 18 years experience is hardly unreasonable.

And, of course, First Circuit precedent has long recognized "the fact that the attorney is willing to take an all-or-nothing arrangement might justify a fee which is higher than the going hourly rate in the community." *Farmington Dowel Prod. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 90 (1st Cir. 1969). Under even a conservative analysis, Class Counsel's lodestar supports the fee provided by the Settlement.

### C. Concepcion's Incentive Award is Reasonable.

The Settlement includes an incentive payment of $5,000 for Concepcion. Ex. 1 at ¶ 23(a). Incentive awards are fairly typical in class action cases. See 4 William B. Rubenstein et al., NEWBERG

ON CLASS ACTIONS § 11:38 (4th ed. 2008). Concepcion fully responded to written discovery in this matter. He actively assisted Class Counsel in negotiating the settlement in this matter and markedly delayed his own recovery for the benefit of the class. Without his commitment to this class, classwide relief would not have been possible.

"In granting incentive awards to named plaintiffs in class actions, courts consider not only the efforts of the plaintiffs in pursuing the claims, but also the important public policy of fostering enforcement of laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves." *Bussie v. Allamerica Fin. Corp.*, No. CIV.A. 97-40204-NMG, 1999 WL 342042, at *3 (D. Mass. May 19, 1999) (Gorton, J.). Here, Concepcion's incentive award is eminently reasonable, as he expended time and effort to bring these claims on behalf of his co-workers. Courts routinely approve incentive payments as a way of compensating class representatives for lending their names, reputations, and efforts to the prosecution of litigation on behalf of others, and to promote class settlements while encouraging plaintiffs to act as "private attorneys general" in the enforcement of state and federal law. *See, e.g., Hernandez v. State Road Auto Sales, Inc.*, No. 1:19-cv-11525-NMG (Gorton, J.) (collecting cases and granting a $2,000 incentive award in an $18,000 settlement); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005)(Young, J.) ("Incentive awards are recognized as serving an important function in promoting class action settlements, particularly where … the named Plaintiff participated actively in the litigation") (quoting *In re Lupron*, 228 F.R.D. 75, 98 (D. Mass. 2005)); *In re Compact Disc Min. Adver. Price Antitrust Litig.*, 292 F. Supp. 2d 184, 189 (D. Me. 2003) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage … an individual to participate in the suit").

Incentive payments are often much higher than that requested here. *See, e.g., Martins v. 3PD, Inc.*, No. 11-11313 (July 22, 2016) (ECF No. 211) (approving total of $60,000 in incentive payments - -$20,000 to each of three named plaintiffs); *Civil v. Spirit Delivery*, No. 13-12635 (D. Mass. July 24, 2018)

(ECF No. 242) ($25,000); *DaSilva v. Border Transfer*, No. 16-11205 (D. Mass. Oct. 16, 2019) (ECF No. 189) ($15,000 each for two named plaintiffs); *see generally Scovil v. FedEx Ground Package Sys., Inc.*, 2014 WL 1057079, at *6 (D. Me. Mar. 14, 2014) (noting in 2014 that recent cases reflected that in "wage and hour cases… awards of $10,000 and $15,000 are not uncommon and on occasion reach $20,000, $30,000 and higher," and approving incentive payments ranging from $10,000 to $20,000 for several named plaintiffs). Accordingly, the Court should approve the proposed incentive awards to Concepcion for his role as class representative.

6.  **CONCLUSION.**

For the reasons set forth above, Concepcion respectfully asks approve the Settlement as fair, reasonable, and adequate.

Date: April 11, 2024.                          Respectfully submitted,

                                               **BRUCKNER BURCH PLLC**

                                               /s/ Richard J. (Rex) Burch
                                               _____
                                               Richard J. (Rex) Burch
                                               11 Greenway Plaza, Suite 3025
                                               Houston, Texas 77046
                                               Phone: 713-877-8065
                                               Fax: 713-877-8065

                                               Philip J. Gordon
                                               Kristen M. Hurley
                                               **Gordon Law Group**
                                               585 Boylston Street
                                               Boston, MA 02116
                                               Phone: (617) 536-1800
                                               Fax: (617) 536-1802

                                               Michael A. Josephson
                                               **Josephson Dunlap LLP**
                                               11 Greenway Plaza, Suite 3050
                                               Houston, Texas 77046
                                               Phone: (713) 352-1100
                                               Fax: (713) 352-3300

**<u>CERTIFICATE OF SERVICE</u>**

I certify I filed this document with the ECF system that will send a copy to the registered participants identified on the Notice of Electronic Filing. All parties in this case are registered.

/s/ Richard J. (Rex) Burch
Richard J. Burch